IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY LLOYD, | ) | Case No. 5:23-CV-01166-SL |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff Timothy Lloyd seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). I find that the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, and I therefore recommend that the Commissioner's final decision denying Mr. Lloyd's applicaitons for DIB and SSI be affirmed.

## II.    Procedural History

Mr. Lloyd filed for DIB on July 30, 2021 and SSI on October 4, 2021, alleging a disability onset date of June 22, 2021. (Tr. 269, 271). The claims were denied initially and on reconsideration. (Tr. 146-65, 168-89). He then requested a hearing before an Administrative Law

Judge. (Tr. 212-13). Mr. Lloyd and a vocational expert (VE) testified before the ALJ on June 9, 2022 (Tr. 112-47).

On July 12, 2022 the ALJ issued a written decision finding Mr. Lloyd not disabled. (Tr. 59-85). The Appeals Council denied his request for review on April 11, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Mr. Lloyd timely filed this action on June 10, 2023. (ECF #1).

III.  **Evidence**

A.  **Personal, Educational, and Vocational Evidence**

Mr. Lloyd was 47 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 77). He graduated from high school. (*Id.*). He has worked as a prep cook and as a machine operator. (*Id.*).

B.  **Relevant Medical Evidence**

On July 23, 2021, Mr. Lloyd established care with Rebekah Stutzman, APRN, CNP, for a knot on his left wrist and a review of his health conditions. (Tr. 432). He further complained of back pain and reported past treatment by a doctor who recommended surgery but would not perform the procedure until he quit smoking. (*Id.*). On examination he had generalized stiffness and tenderness to palpation diffuse throughout his body, and on his left radial wrist he had a small, moveable mass that was tender to palpation. (Tr. 434). He was diagnosed with a ganglion cyst and had an orthopedic consult ordered. He was assessed with diffuse arthralgias and offered a consult with rheumatology. He also was provided a refill of dicyclomine 20 mg for his irritable bowel syndrome. (Tr. 435).

Mr. Lloyd consulted with orthopedist Bradley Pierce, M.D., on August 16, 2021 for treatment of his ganglion cyst, and reported that the cyst would rupture and return, that he felt as

if it was pressing on his nerves, and application of over-the-counter lidocaine cream had brought some relief. (Tr. 516). Mr. Lloyd also reported he was filing for disability due to back problems. (*Id.*). His pain level was a five or six on a ten-point scale. (*Id.*). On examination, the left ulnar nerve exhibited a positive Allen's test. (*Id.*). After discussing the risks, benefits and alternatives with Dr. Pierce, Mr. Lloyd determined to proceed with surgical excision of the ganglion cyst. (*Id.*). On August 30, 2021, Mr. Lloyd had a virtual pre-surgery consult with Jillian Lewis, APRN, CNP, and was cleared for surgery. (Tr. 510, 515). Dr. Pierce surgically removed the ganglion cyst on September 8, 2021 without complications. (Tr. 509-510).

Mr. Lloyd attended an appointment with Jeremy Amps, M.D. on September 20, 2021, for follow up treatment for cervical stenosis, and complained of worsening trouble with dropping objects and balance. (Tr. 499). On examination, he demonstrated good strength, diminished sensation in his fingertips, brisk reflexes, and an inability to perform tandem gait. (Tr. 500). Dr. Amps assessed him with likely cord compression with myelopathy and recommended obtaining a new MRI given the worsening symptoms. (*Id.*). Mr. Lloyd underwent a cervical spine MRI on October 4, 2021, which showed minimal right neural foraminal narrowing at C4-C5, severe bilateral neural foraminal narrowing with mild to moderate spinal canal stenosis at C5-C6, and moderate to severe spinal canal stenosis, moderate to severe bilateral neural foraminal narrowing greater on the right at C6-7. (Tr. 592-93). There were no significant changes when compared to the most recent prior MRI performed on September 30, 2020. (Tr. 593). At his follow up appointment with Dr. Amps, Mr. Lloyd again complained of worsening balance and problems dropping objects, as well as complaints that his leg was falling asleep. (Tr. 613). On examination, he demonstrated 5/5 strength in all muscle groups, diminished sensation in his left hand, and normal gait. (Tr. 615). Dr. Amps noted multilevel degenerative changes of cervical

3

spine, most pronounced at C6-C7 with moderate severe spinal canal stenosis with mild flattening of the cord, and moderate to severe bilateral neural foraminal narrowing. There was also severe bilateral neural foraminal narrowing and mild to moderate spinal canal stenosis at C5-C6. (*Id.*). Dr. Amps assessed that Mr. Lloyd was clinically indicated for anterior cervical discectomy and fusion at C5-6 and C6-7. (*Id.*). Mr. Lloyd agreed with this plan and elected to schedule surgery at a later date. (*Id.*).

Mr. Lloyd attended a mental health assessment at The Counseling Center of Wayne and Holmes Counties with Jordan Garrison, M.D. on August 16, 2021. (Tr. 478-90). He reported long-standing depression and anxiety and that he was recommended to see a counselor after filing for disability benefits. (Tr. 478). He reported mood difficulty and feeling nervous, jittery, and paranoid. (*Id.*). On examination, he had impaired judgment, poor frustration tolerance, difficulty sleeping, difficulty with short-term memory, was easily distracted and had decreased appetite. (Tr. 479). His affect was sad and anxious. (*Id.*). He was assessed with depressive disorder, recurrent, moderate. (*Id.*). He underwent a GAD-7 and PHQ-9 assessment and recommended to follow up with Amanda Brewer, Ph.D. (Tr.485-90).

Mr. Lloyd saw Dr. Brewer on September 27, 2021 and reported being depressed and irritable. (Tr. 599). On examination, he exhibited mild agitation, moderate depression and anxiety, and mild impairment in judgment. (*Id.*). He stated he was easily annoyed and irritated, and his activities were generally reduced to going to the grocery store and attending doctor's appointments, although he had gone fishing a couple of times. (Tr. 600). Dr. Brewer did not observe any significant changes on examination. (*Id.*).

At his November 3, 2021 appointment with Dr. Brewer, Mr. Lloyd reported that he did not believe he could physically perform any jobs and did not think returning to school was a

viable option. (Tr. 602). He reported experiencing a great deal of anger and frustration. (*Id.*). On examination he exhibited moderate agitation, anxiety, and depression, and mild impairment in judgment. (*Id.*).

On March 8, 2022, after his date last insured, Mr. Lloyd attended a consult with rheumatologist Judith Manzon, M.D., for an opinion regarding his diffuse arthralgias. (Tr. 658). He reported chronic back pain and arthralgias since the 1980s, most bothersome in his neck and upper back, with pain varying from five to eight on a ten-point scale, improving with rest and worsening with activities. (*Id.*). He reported no relief with oral NSAIDs, prednisone, gabapentin, amitriptyline, Lyrica, or physical therapy, but noted Tylenol and topical lidocaine did take the edge off of his pain and chiropractic therapy helped a little. (*Id.*). He reported to Dr. Manzon that he had seen pain management and a spinal surgeon but declined surgery. (*Id.*). On examination, he had pain with movement in his cervical back and discomfort in his shoulder, tenderness to percussion of the cervical and thoracic spine, and tenderness of the sacroiliac joints bilaterally but normal range of motion and no motor weakness. (Tr. 661-63). Dr. Manzon assessed him as having no compelling findings on clinical history or examination for a systemic rheumatic disease and that his joint symptoms could be explained by mechanical or degenerative causes. (Tr. 663). She recommended he follow up with pain management as needed. (Tr. 664).

At an April 18, 2022, appointment, Dr. Brewer noted that Mr. Lloyd remained largely status quo and that he viewed himself as a victim of his circumstances; he continued to experience symptoms of anxiety and depression. (Tr. 697). He exhibited moderate impairment in judgment, anxiety, and depression on examination. (*Id.*).

### C.   Medical Opinion Evidence

Mr. Lloyd attended a functional capacity evaluation with Michelle Kunkle, OTR/L, on September 23, 2021. (Tr. 703-07). Ms. Kunkle noted Mr. Lloyd's diagnoses of diffuse arthralgia, IBS, COPD, and emphysema, causing symptoms including anxiety/depression, pain, joints cracking and popping, neck pain, shoulder blade pain, thoracic pain, bilateral hand pain and tingling. (Tr. 705). His pain at rest was rated five or six out of ten, increased with physical activity. (*Id.*). He reported being independent with his activities of daily living. (*Id.*).

On examination, his range of motion was within normal limits. (*Id.*). Based on testing results, Ms. Kunkle opined Mr. Lloyd had the ability to occasionally squat, kneel with use of external support, reach, and stand. (Tr. 706). He had the ability to sit frequently and had good ability to climb stairs. (*Id.*). He walked for 12 minutes with good speed and normal gait. (*Id.*). He demonstrated the ability to lift from the floor 40 pounds occasionally, 20 pounds frequently, and could lift 10 pounds overhead occasionally. (Tr. 704, 706-07). Jordan Garrison, D.O., signed off on the assessment on October 5, 2021. (Tr. 711).

At the initial state agency review on September 28, 2021, psychologist Irma Johnston, Ph.D., did not adopt earlier agency findings from August 12, 2015 and instead found Mr. Lloyd had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (Tr. 149-50). She further found that he could understand, remember, and carry out tasks involving simple instruction, could perform simple work without strict production demands or a fast pace, work with occasional, superficial interaction with others, and work in a static environment. (Tr. 152-54). At reconsideration on December 7, 2021, state agency reviewing psychologist David Dietz, Ph.D., affirmed Dr. Johnston's findings. (Tr. 170-71, 175-76).

On October 12, 2021, also at the initial level, state agency reviewing physician Maria Congbalay, M.D., found that Mr. Lloyd could perform a reduced range of light work. (151-52). Dr. Congbalay further opined he was limited to never climbing ladders, ropes, or scaffolds, occasionally stooping and crouching, and frequently climbing ramps or stairs, balancing, kneeling, and crawling, and that he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 151). She found Mr. Lloyd had no manipulative limitations. (*Id.*). Although Dr. Congbalay indicated the prior findings were being adopted, her findings included additional limitations in his ability to kneel or balance. (Tr. 151-52). At the reconsideration level on January 5, 2022, state agency reviewing physician Michael Lehv, M.D., affirmed Dr. Congbalay's findings but further restricted Mr. Lloyd from all exposure to hazards. (Tr. 170-75).

### D.     Administrative Hearing Evidence

Mr. Lloyd testified at the hearing before the ALJ on June 9, 2022 and described that he lived with his elderly parents and brother in a one-story home with a basement where laundry facilities were located. (Tr. 96). He can drive to the grocery store and doctor's appointments but doesn't take long trips any longer. (Tr. 97). Trips longer than an hour cause pain in his back and neck. (*Id.*). He completed one year of college and worked as a line cook and a press operator. (Tr. 97-98). He was required to lift and carry up to 80 pounds as a line cook and up to 100 pounds as a press operator. (Tr. 98-99).

Mr. Lloyd testified he was unable to work due to pain and his inability to do any heavy lifting. (Tr. 99-100). His pain would fluctuate, but on average, he rated his pain at a six or seven on a ten-point scale. (Tr. 100). He estimated that he could only carry about 30 pounds. (Tr. 100-101). He described shooting pain radiating from the back of his skull, down his arms, and into

his wrists and fingers, left worse than right. (Tr. 101). He described having some difficulty reaching items on the top shelf at stores, although he did not have difficulty doing other things above his head such as washing his hair or putting on a t-shirt. (101-02).

Mr. Lloyd testified that his doctors have recommended surgery for his cervical spine issues but have only given him a 33% chance of successful outcome. (Tr. 102). He had also attempted more conservative treatment, such as injections and physical therapy without relief. (*Id.*). He manages his pain with Tylenol, stretching, and hot packs. (Tr. 102-03). He had attempted Neurontin, but the side effects were not manageable; it would "knock [him] out and make [him] sleep." (Tr. 103). He could stand for 45 minutes to an hour at a time and walk three or four blocks. (Tr. 104).

He described needing a wrist brace but did not have one at the time of the hearing. (Tr. 104). He would open jars with his right hand because his left was usually numb and tingly. (Tr. 104-05). He could button shirts by pinching his thumb and forefinger together on his left hand and pushing through the buttonhole to the right. (Tr. 105). He could use his hands for about 30 to 45 minutes before they would become numb and painful. (Tr. 110). He did not think he could sustain repetitive motion with his hands for a full workday. (Tr. 110-11). He avoids using knives because he is afraid the numbness in his hands would cause him to slip and cut off a finger. (Tr. 111). Similarly, reaching with his arms causes sharp pain to shoot through the back of his skull. (Tr. 111-12).

Mr. Lloyd has an emphysema diagnosis for which he uses an inhaler as needed. (Tr. 105). He generally needs his inhaler a couple of times per week, often due to exposure to smoke or overexertion. (Tr. 105-06).

8

Mr. Lloyd also sees a psychologist twice monthly for his depression and anxiety. (Tr. 106-07). He has previously met with psychiatrists but did not wish to take his prescribed medications. (Tr. 106). He described having crying spells twice per week, mood swings, lack of sleep, and loss of appetite due to his depression. (Tr. 107). He slept three to five hours per night. (*Id.*). He also has difficulty concentrating or focusing for extended periods. (*Id.*). He will go fishing to help cope with his depression but cannot go very often due to high gas prices. (Tr. 108). He had last gone fishing two weeks before the hearing for a couple of hours, with a friend. (*Id.*). He could still cast his own pole. (Tr. 108-09). As for anxiety, he sometimes experiences panic attacks in big, crowded areas. (Tr. 109). He had never been hospitalized for his behavioral health conditions, although he did go to the emergency department for high blood pressure and pulse because of his depression and anxiety. (*Id.*).

The Vocational Expert (VE) then testified. (Tr. 115). She testified that Mr. Lloyd's past work could be identified as prep cook, DOT 317.687-010, medium, unskilled, SVP 2, performed at heavy; and machine operator, DOT 600.380-018, medium, skilled, SVP 6, performed at heavy. (*Id.*). She further testified that a hypothetical individual of Mr. Lloyd's age, education, and work history, limited to light work, who could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, as well as stoop, crouch, and crawl; frequently kneel and balance; frequently push, pull, and operate hand controls with bilateral upper extremities, and frequently reach, handle, finger, and feel with bilateral upper extremities; avoid concentrated exposure to extreme cold, heat, humidity, vibrations, and pulmonary irritants, avoid all exposure to hazards including unprotected heights, commercial driving, and moving mechanical parts; and would be limited to performing simple, routine, and repetitive tasks, but not at a production rate pace; could interact occasionally with supervisors, coworkers, and the general public but at a

superficial level with no sales arbitration, negotiation, conflict resolution, or confrontation; no group, tandem, or collaborative tasks, and no management direction or persuasion of others; only occasional change in routine and relatively static work environment, would not be able to perform Mr. Lloyd's past work. (Tr. 115-16). However, such an individual could perform light, unskilled jobs such as routing clerk, DOT 222.687-022, light, unskilled, SVP 2, with 40,000 jobs available in the national economy; office helper, DOT 239.567-010, light, unskilled, SVP 2, with 15,000 jobs available in the national economy; and price marker, DOT 209.587-034, light, unskilled, SVP 2, 60,000 jobs nationally. (Tr. 117).

If the hypothetical individual were further limited from frequent to occasional reaching, then there would be no jobs available. (*Id.*). If reaching were frequent but handling was reduced from frequently to occasionally, again, no jobs would be available. (*Id.*). If the person from the first hypothetical were reduced to sedentary jobs, they could perform work as a weight tester, DOT 539.485-010, sedentary, unskilled, SVP 2, 1,200 jobs available nationally; document preparer, DOT 249.587-018, sedentary, unskilled, SVP 2, 50,000 jobs available nationally; and circuit board assembler, DOT 726.684-110, sedentary, unskilled, SVP 2, 1,100 jobs available nationally. (Tr. 117-18). However, if that sedentary hypothetical were reduced to occasional reaching, no jobs would be available. (Tr. 118). If the individual were limited in their social interaction to isolation with only occasional interaction with supervisors but no interaction or contact with coworkers or the general public, no jobs would be available in either light or sedentary exertional levels. (*Id.*).

As for time off-task or absenteeism, the VE testified that employers would tolerate no more than 10% of the time off-task and no more than one absence per month. (Tr. 118-19).

**IV.    The ALJ's Decision**

In his decision, the ALJ issued the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2021. This finding departs from that of the previous decision, a reflection of additional quarters of coverage credited the claimant on his work record.

2.    The claimant has not engaged in substantial gainful activity since June 22, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*). Except that this finding recites the alleged onset date for the present claim, it adheres to that of the previous decision.

3.    The claimant has the following severe impairments: cervical degenerative disc disease/stenosis/spondylosis/myelopathy [hereinafter, collectively, the "cervical impairment"], degenerative disc disease of the thoracic spine, degenerative disc disease of the lumbar spine, avascular necrosis of the left hip, ganglion cyst of the left wrist, status-post excision, emphysema, irritable bowel syndrome, major depressive disorder and anxiety disorder-unspecified (20 CFR 404.1520(c) and 416.920(c)). This finding departs from that of the previous decision, in order to account for the severe impairments documented in the current evidence.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). This finding adheres to that of the previous decision. 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may frequently kneel, balance, may occasionally stoop, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently push and/or pull [including the operation of hand controls], reach, handle, finger and feel with the bilateral upper extremities; the claimant must avoid concentrated exposure to vibration, humidity, extremes of heat and cold, and pulmonary irritants, including dust, odors, gases, fumes and poor ventilation, and must avoid all exposure to unprotected heights, moving mechanical parts and commercial driving; the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a setting free of high production rate pace [as is found in assembly line work], which setting requires no more than occasional and superficial [defined as precluding group, tandem and collaborative tasks as well as tasks involving sales, arbitration, negotiation, confrontation, conflict resolution, the management of, direction of, or persuasion of, others] interaction with co-workers, supervisors or the public,

11

which setting is routine and relatively static, in that it contemplates occasional changes. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments documented in the current evidence.

5.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). This finding adheres to that of the previous decision.

6.      The claimant was born on February 11, 1974 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). This finding departs from that of the previous decision, in order to reflect the claimant's attainment of greater chronological age.

7.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964). This finding adheres to that of the previous decision.

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). This finding adheres to that of the previous decision.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). This finding adheres to that of the previous decision.

10.     The claimant has not been under a disability, as defined in the Social Security Act, from June 22, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)). Except that this finding recites the alleged onset date for the present claim, it adheres to that of the previous decision.

(Tr. 65-78).

## V.      Law & Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his Residual Functional Capacity; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

B.      **Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).

---

[1]      The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 538120, *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Mr. Lloyd brings four issues for this Court's review: (1) whether the ALJ's adoption of the prior ALJ's findings lacked the support of substantial evidence; (2) whether the ALJ erred by failing to find the Functional Capacity Evaluation persuasive; (3) whether the ALJ committed

14

harmful error by failing to include RFC limitations related to Mr. Lloyd's short-term memory loss; or (4) limitations related to his pain. (ECF Doc. 7, PageID 751). I address each in turn below.

### A. The ALJ did not adopt the prior findings and his decision is supported by substantial evidence.

Mr. Lloyd first argues the ALJ erred by applying the wrong standard of review regarding prior findings by ALJ Paula Goodrich. (ECF Doc. 7, PageID 758). He argues that even though the ALJ stated he was departing from the prior decision, there was new and material evidence differing from the prior decision warranting a different finding with greater physical limitations. (*Id.* at PageID 758-62). He points to *DiLauro v. Commissioner* for support of his proposition that "adopting the findings of the prior ALJ casts a pall over the entire hearing" and unfairly causes a plaintiff to face "an unwarranted presumption that the findings of the prior hearing were correct." (*Id.* at PageID 761, citing to *DiLauro v. Comm'r of Soc. Sec.*, No. 5:19cv2691, 2021 WL 1175415, at *3-4 (N.D. Ohio Mar. 29, 2021); *see also* ECF Doc. 10, PageID 793-94). Mr. Lloyd states that because the ALJ relied on the state agency reviewing physician opinions, he failed to independently review Mr. Lloyd's impairments for the new period of disability. (ECF Doc. 7, PageID 762).

The Commissioner counters that Mr. Lloyd's argument is patently incorrect and presents a comparison of the two RFC assessments outlining the significant differences in physical and mental accommodations between each. (ECF Doc. 9, PageID 782-83). In short, the ALJ "explicitly pointed out that the RFC in the instant case 'departs from that of the previous decision, in order to accommodate the present state of the impairments documented in the current evidence.'" (*Id.* at PageID 783, quoting Tr. 69).

For the reasons that follow, I agree that the ALJ provided a "fresh look" to the evidence as required and did not err, and recommend the District Court affirm.

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). The Sixth Circuit held that *res judicata* applies in the administrative context and thus the second ALJ was bound by the RFC findings of the first ALJ because there had been no new or additional evidence of an improvement in the claimant's condition. *Id*. at 841-42 ("Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.").

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling (AR) 98-4(6):

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6) (S.S.A.), 1998 WL 283902, *3 (June 1, 1998).

Subsequently, in *Earley v. Commissioner*, the Sixth Circuit modified its holding in *Drummond*, explaining that the "[u]nusual facts" had led to an overstatement of the principles of *res judicata* involved in subsequent applications under the Social Security Act. *Earley v. Comm'r of Soc. Sec.,* 893 F.3d 929, 933 (6th Cir. 2018). The court clarified that *res judicata* barred only successive litigation of the same claim, and that a subsequent claim alleging a later onset date and disability period was not the same claim. *Id.* ("An individual may file a second

16

application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold."). It stated, "human health is rarely static. . . . Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.*

Nevertheless, "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934. Thus, when a new application seeks benefits for a distinct time period, that application is entitled to a "fresh look" while still being mindful of past agency rulings and their corresponding record. *Id.* at 931.

I find Mr. Lloyd's arguments in this regard misstate the decision and the applicable caselaw. In the 2022 decision, he obtained the "fresh look" necessary for his new application without the preclusive effect of past Agency decisions, as both *Drummond* and *Earley* require. Throughout the decision, the ALJ specifically delineated where he departed from the prior ALJ's decision. (*See* Tr. 65-79). There is no error here.

To more specifically address Mr. Lloyd's arguments, he raises error on two fronts: that "[t]here was new and material evidence, but the ALJ erroneously relied on the opinions of the State Agency reviewing sources" and this new and material evidence "warranted a different finding and greater physical limitations." (ECF Doc. 7, PageID 761).

I first note the ALJ did not fully rely on state agency reviewing physicians' opinions. Rather, the ALJ found these opinions only "partially persuasive":

> The state agency medical consultants, Maria Congbalay, M.D., and Michael Lehv, M.D., each indicated that the claimant would be able to perform light work, that he could frequently balance, kneel, crawl, climb ramps and stairs, could occasionally stoop, crouch, never climb ladders, ropes or scaffolds, and should avoid

concentrated exposure to fumes, odors, dust, gases and poor ventilation. . . . These opinions understate the claimant's postural, manipulative, and environmental limitations, but remain partially consistent with, and supported by, the overall evidence of record and are partially persuasive.

(Tr. 74-75). Ultimately, with respect to physical limitations, the ALJ considered the agency opinion evidence, compared it against Mr. Lloyd's diagnoses, symptoms, and other limitations, and concluded the following restrictions were appropriate:

Restriction to light work is appropriate on this evidence. Postural restrictions are appropriate, increasing in degree as additional segments of his spine are brought into play. Manipulative restrictions are appropriate, owing to his cervical impairment and any residuals of his cyst excision. Some protection against vibration is appropriate, owing to his spine impairment. Restrictions against pulmonary "triggers" are appropriate given his diagnosis of emphysema, although I note he volitionally exposes himself to fumes, odors, and gases by means of his cigarette and marijuana habits. Precautionary against a sudden "burst" of pain from whatever source, abdominal cramping from irritable bowel disease, or sudden onset dyspneic episode, the claimant should not be asked to work at unprotected height, in the vicinity of inherently dangerous machinery, or to use unguarded climbing apparatuses.

(Tr. 75 (internal citations omitted)). Thus, it appears that the ALJ adopted some portion of the agency physicians' opinions, but also deviated from these opinions to include manipulative limitations, protection against vibration, and other hazards. This is consistent with a "partially persuasive" finding and is consistent with the "fresh look" *Earley* requires. I find no error here.

I likewise find unpersuasive the argument that the ALJ should have found greater RFC restrictions than were in the prior ALJ decision. In the August 12, 2015 decision, ALJ Goodrich made the following RFC determination:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b); however, the claimant can never climb ladders, ropes, or scaffolds, he can no more than occasionally stoop or crouch, and he is limited to frequent crawling and climbing of ramps/stairs. In addition, the claimant must avoid concentrated exposure to dusts, odors, fumes, gases, poorly ventilated work areas and similar respiratory irritants. Due to the combination of his impairments, the claimant is limited to unskilled work.

18

(Tr. 129).

In the current RFC, ALJ Schmitz provided the following RFC determination:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may frequently kneel, balance, may occasionally stoop, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently push and/or pull [including the operation of hand controls], reach, handle, finger and feel with the bilateral upper extremities; the claimant must avoid concentrated exposure to vibration, humidity, extremes of heat and cold, and pulmonary irritants, including dust, odors, gases, fumes and poor ventilation, and must avoid all exposure to unprotected heights, moving mechanical parts and commercial driving; the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a setting free of high production rate pace [as is found in assembly line work], which setting requires no more than occasional and superficial [defined as precluding group, tandem and collaborative tasks as well as tasks involving sales, arbitration, negotiation, confrontation, conflict resolution, the management of, direction of, or persuasion of, others] interaction with co-workers, supervisors or the public, which setting is routine and relatively static, in that it contemplates occasional changes. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments documented in the current evidence.

(Tr. 69). It is patently clear that ALJ Schmitz included a number of new restrictions in his RFC findings and made "a different finding and greater physical limitations" as Mr. Lloyd now petitions the Court. (ECF Doc. 7, PageID 761). I find no error with respect to *Drummond* or *Earley*; the ALJ considered the evidence under the new period and the 2015 RFC finding did not have the preclusive effect Mr. Lloyd purports, nor did it "cast a pall over the entire hearing." (*Id.*, citing to *DiLauro*, No. 5:19cv2691, 2021 WL 1175415, at *3-4).

I find no error with respect to the first issue and therefore recommend the District Court affirm.

**B.      The ALJ did not err in his findings regarding the Functional Capacity Evaluation.**

Mr. Lloyd next argues the ALJ erred in his evaluation of the functional capacity evaluation (FCE) performed by Michelle Kunkle and countersigned by Dr. Garrison. (ECF Doc. 7, PageID 762-65). In essence, he argues the ALJ failed to sufficiently articulate how he considered this opinion according to the regulations, and thus, failed to provide an accurate and logical bridge between the evidence and the result. (*Id.*). He argues the ALJ claimed the FCE was contrary to the medical evidence "but failed to point to any evidence except the alleged refusal . . . to perform some tests (he only refused the rapid tests due to problems with his knees and balance)." (*Id.* at PageID 765). In his view, this decision was not supported by substantial evidence. (*Id.*).

The Commissioner argues in counterpoint that the ALJ's consideration of the FCE was supported by substantial evidence and presented in agency terms of "supportability" and "consistency" and thus is consistent with the regulations. (ECF Doc. 9, PageID 784-86). He presents citations to the record to demonstrate that the ALJ appropriately considered these factors and sufficiently explained them to support the decision and provide the necessary explanation for subsequent review. (*Id.*).

I agree with the Commissioner. The ALJ appropriately considered and explained his consideration of the FCE in the terms required by the regulation and did not misstate the evidence, thereby providing his decision the support of substantial evidence.

On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific

20

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[2]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

And, throughout the decision, the ALJ must provide a sufficiently thorough explanation of his decision so as to facilitate subsequent review. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

---

[2]        Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

Here, the ALJ considered the FTE and explained his decision as follows:

> An occupational therapist, Michelle Kunkle, OTR, offered an opinion based on a functional capacity evaluation dated September 16, 2021, which indicated that the claimant could perform sedentary lifting and carrying from shoulder to overhead, up to medium lifting and carrying, could occasionally bend, squat, kneel [with external support], could occasionally stand, occasionally walk, frequently sit, and occasionally reach. A single page of this report was signed by the claimant's primary care physician, Jordan Garrison, D.O. Ms. Kunkle administered an objective examination and is reporting within the bounds of her professional certifications. However, the claimant refused to attempt several of the sub-tests, and there were no discernible, objective measures of reliability of effort included. This opinion is only marginally consistent with, and supported by, the overall evidence of record, described in digest form above, and is not persuasive. To the extent the page signed by Dr. Garrison was more than acknowledgement of receipt of the report, her opinion is not persuasive, for the reasons already given.

(Tr. 75 (internal citations omitted)). As is recounted above, the ALJ described his FCE findings in the regulatory terms of "supportability" and "consistency" as required. (*See id.*). There is no error here.

As to Mr. Lloyd's contention that the ALJ mischaracterized the effort he expended during the test, this also appears to be an overstatement of the record evidence. As the ALJ states, Mr. Lloyd "refused to attempt several of the sub-tests, and there were no discernible, objective measures of reliability of effort included." (*Id.*). In looking to that record, Ms. Kunkle stated Mr. Lloyd "refused 10/10 [bending] rapidly due to 6/10 low back pain"; he "refused 10/10 [squatting] rapidly"; and he "refused to kneel 10/10 rapidly." (Tr. 706). Given that Mr. Lloyd refused rapid motion in three areas – bending, squatting, and kneeling – this appears to be consistent with the ALJ's characterization of "refused to attempt several of the sub-tests" and I find no error. I also note there does not appear to be a specific notation as to the reliability of Mr. Lloyd's effort during the test (*see* Tr. 704-07), although Ms. Kunkle does include a behavioral comment to the effect of "p[atien]t participated and was cooperative throughout assessment" (Tr. 705). However, cooperation and participation do not necessarily correlate with an objective

22

determination of the effort Mr. Lloyd expended in his attempts to complete testing. Again, this does not appear to be a mischaracterization by the ALJ. I find no error.

I therefore recommend the District Court affirm on this issue.

**C.     The ALJ did not fail to include RFC limitations related to Mr. Lloyd's short-term memory loss and thus did not err.**

Mr. Lloyd states the ALJ failed to include limitations in the RFC related to his short-term memory loss. (ECF Doc. 7, PageID 765-67). Mr. Lloyd states "the ALJ failed to discuss the limitations related to [his] memory loss. Even though the ALJ acknowledged that [he] had memory loss, he erroneously failed to include any associated restrictions in his RFC." (*Id.* at PageID 766, citing to *Stidom v. Comm'r of Soc. Sec. Admin.*, No. 5:21cv211, 2022 WL 1651393, at *16 (N.D. Ohio May 10, 2022)).

The Commissioner points out the ALJ did include limitations for Mr. Lloyd's short-term memory deficits in the RFC. (ECF Doc. 9, PageID 786-87). Specifically, the ALJ included limitations to simple, routine, and repetitive tasks, which both this district and the Sixth Circuit have determined to be sufficient limitations to accommodate issues such as short-term memory loss. (*Id.*, citing to *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) and *Thornton v. Saul*, No. 4:20-cv-01420, 2021 WL 3934332, at *6, (N.D. Ohio June 21, 2021), *report and recommendation adopted*, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021)).

Before proceeding to the fourth step in the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011). At Step Four, the ALJ determines whether the assessed RFC permits the claimant to perform past relevant work. *Id.* "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an

23

individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p.

More particularly to Mr. Lloyd's short-term memory issue, the ALJ will evaluate the severity of a claimant's mental limitations to decide how those limitations affect their capacity to work. 20 C.F.R. § 404.1545(c) ("When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis"). The Sixth Circuit has previously determined that limitations such as "no more than simple instruction" can accommodate a claimant's limited ability to understand and remember due to memory impairments. *See Parks v. Soc. Sec. Admin*, 413 F. App'x 856, 866 (6th Cir. 2011). Similarly, the Sixth Circuit has also held that an ALJ may associate memory deficiencies with the processing of complex information and thereby limit a claimant to "simple," "routine," or "repetitive" tasks to account for such deficiencies. *Smith-Johnson*, 579 F. App'x at 437.

With respect to the mental impairments, the ALJ stated the following:

> the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a setting free of high production rate pace [as is found in assembly line work], which setting requires no more than occasional and superficial [defined as precluding group, tandem and collaborative tasks as well as tasks involving sales, arbitration, negotiation, confrontation, conflict resolution, the management of, direction of, or persuasion of, others] interaction with co-workers, supervisors or the public, which setting is routine and relatively static, in that it contemplates occasional changes. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments documented in the current evidence.

(Tr. 69). The ALJ explained the mental health limitations by stating:

24

> The claimant reports work-preclusive limitations . . . [including] chronic anxiety and depression, causing deficits of short-term memory, an intolerance of others, impaired concentration and poor frustration tolerance.

(Tr. 70). The ALJ also noted Mr. Lloyd does not require medication to manage his mental health conditions (Tr. 72), that he began attending counseling in August 2021 (Tr. 73), but that it was accessed in furtherance of his disability claim (*id.*). The ALJ reviewed these limited counseling records both during the relevant period (August 18 and September 27, 2021) and from after the date last insured (April 18, 2022) but determined that the evidence does not support as severe of limitations as Mr. Lloyd alleges. (Tr. 73). Nonetheless, the ALJ still included limitations including "simple, routine, repetitive tasks" and in a setting that "is routine and relatively static, in that it contemplates occasional changes." (Tr. 69). Thus, the ALJ has included RFC limitations for Mr. Lloyd's short-term memory loss, consistent with Sixth Circuit precedent. Furthermore, Mr. Lloyd bears the burden at this stage to show that the RFC does not accommodate his limitations but has not carried this burden to demonstrate otherwise.

His contention that the ALJ erred in this regard is not well-taken and I decline to recommend remand on this issue.

### D. The ALJ did not err in failing to include RFC limitations related to Mr. Lloyd's pain.

Finally, Mr. Lloyd argues the ALJ erred by failing to use the two-step process required when assessing his subjective symptom statements. (ECF Doc. 7, PageID 767-68). He states, "[d]espite the fact that the record documented pain . . . the ALJ erroneously failed to include any related limitations in his RFC." (*Id.* at PageID 768). The Commissioner responds that substantial evidence supports the ALJ's evaluation of Mr. Lloyd's subjective symptoms of pain and he appropriately followed the relevant regulations. (ECF Doc. 9, PageID 788-91). I likewise agree

25

with the Commissioner that the ALJ appropriately considered Mr. Lloyd's subjective symptom statements and his determination is supported by substantial evidence.

An ALJ is required to follow a two-step process for evaluating a claimant's subjective symptom complaints. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the claimant's symptoms and determines the extent to which they limit their ability to perform work-related activities. *Id*.

At the second stage, the ALJ considers the entire case record, including objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id*. In addition, the ALJ evaluates a claimant's statements against the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), including:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ is not required to include all seven factors in their analysis and may discuss only those relevant to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints to be inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. Rather, the ALJ is required to explain which of the claimant's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to their conclusions. SSR 16-3p at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments*." Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective symptom evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate

evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Likewise, I will not second-guess the ALJ's decision regarding Mr. Lloyd's complaints of pain. It is patently clear from his decision that he did indeed consider Mr. Lloyd's back pain and included RFC accommodations accordingly, and that he followed the two-step process required by SSR 16-3p when reaching his conclusions.

First, the ALJ notes the two-step process required by SSR 16-3p at the beginning of his RFC explanation. (Tr. 69-70). He then states "[t]he claimant reports work-preclusive limitations, derivative of a spine disorder . . . including constant neck and back pain" and reviews available diagnostic imaging from September 2020 and October 2021 to confirm the same. (Tr. 70). Nonetheless, the ALJ determines that although "these findings would be consistent with the claimant's allegations of neck and back pain, the record, when considered as a whole, is not supportive of the contention that the existence of these impairments would be preclusive of all types of work." (*Id.*). He then reviews the treatments (or lack thereof) that Mr. Lloyd sought to relieve his pain:

- The claimant neither follows, nor discernibly has followed, any regimen of chronic prescription medications discernibly addressed to these impairments.

- He describes exercise as the most effective method of remediating his cervical symptoms but has not attended physical therapy. In September 2020, was assessed as not requiring urgent cervical surgery.

- After October 2021 imaging did not indicate significant worsening of his cervical condition, he elected, but would later report declining, a cervical fusion surgery.

(*Id.* (internal citations omitted)). The ALJ also considered other diagnostic imaging and Mr. Lloyd's doctor's assessments of his abilities:

- Diagnostic scanning of his lumbar spine was assessed as looking "absolutely normal" in September 2020, and as his avascular necrosis was asymptomatic, his treating source raised no objection to his return to work.

(Tr. 71 (internal citations omitted)). The ALJ also noted clinical examination findings from

August 2021 and March 2022:

- Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated August 16, 2021, which reported no weakness or sensory deficit, with normal motor skills and normal gait, or one dated March 8, 2022, which indicated tenderness of the cervical and thoracic spines, and pain with normal cervical range of motion, and tenderness of the sacroiliac joint but otherwise no spinal tenderness, with normal strength, and gait.

In all, it appears the ALJ appropriately considered the relevant factors and provided sufficient

explanation of his determination:

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the claimant has a past medical history including a pain disorder with psychological component. He has described various treatment forms stimulated solely by his pursuit of disability benefits, including a functional capacity evaluation and a "lot of other Dr. appointments", rheumatology consultation, and behavioral health therapy, while at the same time declining an offered cervical fusion, "reluctantly" accepting [and not discernibly pursuing] a referral to employment services, and remaining "very convinced" he is unemployable.

(Tr. 74 (internal citations omitted)).

I find no reversible error and decline to disturb his determination. I therefore recommend

the District Court affirm.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, I recommend that the Commissioner's final decision denying Mr. Lloyd's

applications for DIB and SSI be affirmed.

29

Dated: April 30, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).